The United States Court of Appeals for the Ninth Circuit is now in session. Hello everyone, this is Judge Friedland again and thank you for your flexibility in appearing today by telephone and for your patience while we just worked out the technical difficulties that we just had with having the wrong phone number to call. And we wanted to send our best wishes to Mr. Lippo's family. We're going to hear argument today in Morris v. Charter Communications, No. 18-55739, in which each slide will have 10 minutes. I was going to keep time on a stopwatch here in front of me, but I realize no one else can see it, so please watch your time as well. And if you would like me to give you a two-minute left, please let me know that when you begin speaking and I will try to watch the time carefully enough to do that. Anyone have any questions before we begin? This is Jeff Lippo. No, Your Honor. Thank you very much. And I guess a two-minute warning would be nice. Okay, great. Well, so then, if you're ready to proceed, please go ahead. Thank you very much. If it pleases the Court, I'm Jeff Lippo and I represent the appellant. Preliminarily, I want to say it's an honor for me to appear before the Court after 41 years of practice. This is the first opportunity I've had to argue before the Ninth Circuit, and I want to apologize if my manner of demeanor is more of a trial lawyer than an appellate lawyer. I want to say that, viewing this through the lens of a trial lawyer, I firmly believe that this is a case that I could have won before a jury, but we never had the opportunity because we believe the trial court erroneously granted the motion for summary judgment. I think fundamentally, the error of the trial court was failing to view competent evidence that we submitted in a light most favorable to the plaintiff as the party opposing the summary judgment, and to make the reasonable inferences therefrom that raised tribal issues of fact. The issue in this case, I think, fundamentally focuses on pretext. The trial court found that the plaintiff made a prima facie showing of retaliation under the McDonnell Douglas test. The court found, appropriately, that the defendant articulated a legitimate business reason for its decision to terminate plaintiff, and the focus of the dispute, I believe, in this legal dispute here is on whether or not there are tribal issues of material fact as to whether or not the termination was pretextual. Could I stop you there? I actually have a question about whether plaintiff even made out the prima facie case in terms of whether she reasonably believed she was reporting unlawful conduct at all. I had trouble finding any California case that said that it would be a violation to make a single comment. Can you help me with how this single comment was a violation or at least close enough to a violation that the plaintiff reasonably thought she was reporting unlawful conduct? Yes, Your Honor. The comment occurred in the workplace by the district manager, Mr. Hardestay, and it was interpreted by not only plaintiff but other African-American employees as racist in nature. Plaintiff wasn't the only one who complained about the conduct. Two other employees whose declarations we submitted in our opposition felt similarly. But the California Supreme Court in Lyle v. Warner Brothers said that isolated comments do not violate the FEHA, unless at least that they're severe in the extreme. So this was not even just isolated comments, plural, but a single comment. And I'm not sure that it was severe in the extreme, even if it was offensive. Well, I agree with Your Honor, but the issue here is not... Plaintiff doesn't have to prove that the comment rose to the level of a hostile work environment comment. All plaintiff has to show is that she reasonably believed that the comment was hostile and complained about it. And because of that complaint... But doesn't she have to reasonably believe that the single comment created a hostile work environment? And I'm not sure... My point is, I'm not sure that's reasonable. She doesn't have... Well, she did... The complaint does not have to, as a matter of law, create a hostile work environment. A person can be the victim of a single act of what they perceive to be sexual harassment and believe reasonably that they were sexually harassed, even though it might not sustain a claim for sexual harassment. But if they report that, that's still a protected activity. And what case do you have that says, like, one comment that is perceived to be harassing is enough to make it a reasonable thing to think there's a hostile work environment? Well, first of all, I don't know if there's a... The case law holds that it's the reasonable belief of the person reporting that creates the protected activity. I don't know if there's a case that deals with this. I'm actually fumbling here, because to be candid with you, I wasn't... Let me just see if... I don't know if I have a case at my fingertips, but I know the California law strongly holds that the issue is not whether or not the conduct was itself a violation of the FIA, but whether the person reporting it had a reasonable belief and in good faith reported what they believed was a violation. So your theory is... Excuse me, this is Judge Schroeder. So your theory is that this is retaliatory conduct for the reporting of the incident, not that the incident itself created a hostile work environment. Is that correct? That's absolutely correct, Your Honor. But... The reporting itself is the protected activity, and even if the report is, shall we say, erroneous, in other words, as a matter of law, it doesn't rise to a violation of the FIA, but the report itself was made in good faith by a person who had an experience that they reasonably believed fell within the context of a violation, and the activity is protected. The issue here is did Ms. Morris engage in a protected activity when she complained about Mr. Hardestay's conduct, not whether or not Mr. Hardestay's conduct was sufficient to support a cause of action for a hostile work environment? Well, I believe that the California Court of Appeals has said, at least in Dinslage v. City and County of San Francisco, that to make out a claim for retaliation, the person must have both subjectively believed that the employer was engaged in unlawful employment practices, but also that it was objectively reasonable to think so. And so I'm not sure it's true that her subjective good faith is really the only thing that matters here, but it sounds like you're getting low on time, so I think maybe we should let you go on to the pretext issue. Well, I do want to say that perhaps the objectivity is established by the fact that other employees had the same feelings. Right. Either way, the question is whether or not she was terminated for the reporting or whether they had legitimate reasons for terminating her. That's why she was terminated, isn't that correct? That's the issue, Your Honor. Yeah. She engaged in a protected activity when she reported this. So, moving on, you know, the gravamen of the legitimate business reason is that by creating multiple work orders on a single transaction, that that was fraudulent. And we submitted substantial evidence showing that it was, in fact, a common thing in the workplace for multiple work orders to be generated in a single transaction. We had three employees who filed declarations on that. And, you know, the evidence... Counselor, can I ask a question about that? Because I agree, I read the evidence that you had, and it does seem like there's a high likelihood or a number of instances where multiple work orders would be created. But that doesn't preclude the alternative that fraudulent work orders could also be submitted. Apparently, there is a way to submit these in a way that, you know, artificially inflates the commissions. And so I could imagine an employer saying, wait a second, you know, they're treating this as theft from the company, effectively. And they did an investigation. What regard are we supposed to give to that investigation? The fact that the investigation, you know, that there could be reasons why these work orders, in some instances, could be duplicated. If the company looks at it and says, yeah, we don't believe that in these cases, does that just automatically create a triable issue of fact? Or can we give any credibility to this investigation that took place? Well, the investigation didn't distinguish between, you know, one multiple work order as opposed to another one. What was reported to HR by Mr. Hardestay was that they audited 93 transactions and 27 had multiple work orders. And it was just... But your client was asked about the reasons for those multiple work orders. And the interviewer said that, in her opinion, she didn't find the explanations credible. Presumably, if your client had come up with a credible reason, and it sounds like there are many potentially credible reasons why multiple work orders would be done, that would have been a different conclusion. Well, you know, the defendant, in its argument and its evidence, never said, well, some work orders, multiple work orders, were legitimate, and some weren't. Some were fraudulent. Their whole presentation is that multiple work orders are forbidden, that employees are instructed not to do it, and that it artificially inflates commissions. That's their position. And, you know, 27, yeah, there's legitimate reason for, you know, 10 of them, 15 of them, but the rest of them, no, no, no, it's pure fraud. They don't do that. They just say it's improper, and you can't have multiple work orders. And, you know, we presented evidence that, first of all, the evidence we presented is that every week the store manager sits down with each salesperson and goes over their prior week's sales, and they have in front of them all their work orders. And the inference from that is, well, you know, the manager would be aware, right, you know, during this week after week, year after year, that there are multiple, you know, there's some transactions that have multiple work orders in a single transaction. And all these witnesses that we submitted testified they were never counseled that it was improper to do it. They were never disciplined for it. They were never told that anything they had done was wrong with regards to that. So, you know, the inference from that is that, you know, it does happen, and the store managers let it happen. Council, sorry, I think I apologize for the noise my phone made when we got to zero. I didn't want to interrupt and say two minutes were left, but now we're way past zero. So I will still give you two minutes for rebuttal, but I think I need to cut you off now. Okay, that was the fastest ten minutes I can recall. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, this is Katie Morris, not related to the plaintiff, Cynthia Morris, just have the same last name. Counsel for Respondents, Charter Communications, and Time Warner Cable. I too thank you for the opportunity for this appearance. It is also my first Ninth Circuit appearance, and like Plaintiff's Counsel, I am also primarily a trial attorney, not an appellate attorney, so I too ask for forgiveness for any arguments that are more trial-related. So I just wanted to respond to a few of the comments that were made by Plaintiff's Counsel just in his last argument about the company's position that whenever there's multiple orders, it's automatically a violation of company policy. That's actually not what the evidence shows. What the evidence shows is that out of the 93 multiple work orders that were discovered when they did the audit, only 27 of them were found to be illegitimate, meaning that the remainder of those were legitimate situations where there was a reason to have two orders on the same account. There was only 27 out of the 93 that were only one or two minutes apart, and those were the ones that they took issue with. And when they interviewed her, the plaintiff, she admitted that she put in multiple orders, and she said she just didn't think that there was anything wrong with that. She said some of them might have been because the customer changed their mind afterwards, but she didn't say all of them were about that. She simply didn't have a reason for it. She said that not only in her interview with the investigators, but also at her deposition in this matter. With regard to whether or not it was common in the workplace for there to be multiple work orders, there's simply no evidence showing that this was a common thing or that it was accepted just because two other employees happened to also engage in this inappropriate conduct doesn't make it okay. Well, counsel, can I push back a little bit on that? Because, I mean, that's sort of the impression I got until I looked at this, at Morris' affidavit, and I got to be honest, like a lot of these, it seems like this is a common occurrence. I mean, I don't know how to quantify that, but the reasons or the bases in Morris' declaration for when you would put in multiple work orders seems to be very common. Someone calling in and changing their equipment or their plan, their cable plan, I mean, that didn't seem to me to happen all the time. So, it seems to me there's got to be something distinguishing here, and I think you were hitting on it at the beginning with the 27 out of 93 were determined to be illegitimate. What was Miss Morris' reasoning for those 27? Well, correct. Yeah, she did not have a reason for those 27. The thing was, you're right, there is times when sometimes you would have multiple orders. In her case, out of the red flag on these 27 were that they were entered literally like one minute apart. She would take off an HBO order and then put it right back on one minute later, which means the person was still standing right in front of her when she was entering that order, whereas other instances of multiple work orders would be in situations, you know, they would be maybe 10 minutes apart. The person, you'd already entered the order, done it, and then maybe they changed their mind or they came in later that day and exchanged something or they called back or whatever the case may be. She didn't really have an explanation for those ones, and that's why they held them against her for those particular ones. Now, in this case, though, I think we're sort of getting in the weeds here because this case is a very simple, you know, a straightforward case of retaliation, and in this case there simply is no causal link between her termination and the investigation and this complaint about this comment, which I agree with your analysis that it wasn't, in fact, it didn't rise to the level of harassment and it wasn't reasonable for her to even believe it. She admitted in her deposition that after the comment was made and they spoke to her, the comment was made on March 5th, they spoke to her on March 8th, she didn't complain that it was racially motivated or that it was harassing, she just said it was an inappropriate comment to both Mr. Hardesty and her supervisor, Ms. Santiago. Who was, this is just for, who was Hardesty? Hardesty was the manager. So, Ms. Santiago was the supervisor that was there on a day-to-day basis. Mr. Hardesty was the manager who only occasionally went to the store. But he was off-site and he was coming to the store as the overall manager. Correct, and he had been told, there had been complaints that the employees on Saturdays were not working and that's why he went to the store that day. And he was happy when he got in the store and he saw all the employees in there working available for customers and that's why he said, oh, glad I didn't walk in on an illegal dice game. And he explained that he had recently seen a Geico commercial where, you know, all, when the, you know, the cat's away, the mice will play and all the employees were not working and then when the boss walked in, they all ran to their desks. And that's what spawned the comment. And anyway, but the point is that she didn't actually complain about this comment until March 28th, which was after the audit was concluded. And in fact, the comment wasn't even made until March 5th, okay? The audit into Ms. Morris' conduct began in February and there's absolutely no evidence to controverse that. A super, a, an agent in a different store in the Van Nuys store had recently been terminated for this exact conduct. And Mr. Hardesty was the manager of that store. And he told Ms. Santiago, the supervisor, about that incident and said, hey, if there's anybody in your store that you think might be engaging in this type of conduct, I want you to audit their behavior. And at that time, in the beginning of February, Ms. Santiago said, there are two employees actually that are, that I think engage in this kind of conduct. I'm going to do an audit on them. He said, yes, please do. And she informed Mr. Quintana, the HR manager, that she was going to do the investigation and she started the audit in February before the comment was ever made. The two people that were investigated, Mr. Franco and Ms. Morris, were both audited and they were both terminated for this identical conduct. Mr. Franco never made a complaint about this comment. I mean, this comment had nothing to do with Ms. Morris' termination. It was a completely legitimate audit that was done on employees for this kind of conduct. 19 other employees were terminated for the exact type of violations of their standards of business conduct. What happened to the other people who complained about the comment? Nothing. They did not get terminated. They did not get nothing. Ms. Bolden-Wafer, the first one, in fact, who had complained about Mr. Hardesty's comment, and she also admitted that she entered multiple work orders. She wasn't terminated. She wasn't even investigated. So clearly this comment and any complaint about it had absolutely nothing to do with Ms. Morris' termination. Can I, can I, you said she wasn't investigated. How was it determined who would be investigated? I guess that... Yes, so when Mr. Hardesty was talking to the supervisor of the store, telling her about that other employee in a different store that had been terminated for fraudulently entering work orders to increase his commission, he asked Ms. Santiago, you know, if there's anybody in your store that you think may be engaging in this conduct, we'd like you to audit them. And at that point, Ms. Santiago had just been informed by some of the people in her store that they were concerned with Ms. Morris, the plaintiff, because they said on Saturdays she was the lead and she was often in the back of the store doing paperwork or doing who knows what, but not helping the customers. And that happened in February. Was that communication in February or was that in March after the comment was made? It was prior to the comment. Okay. And she had, yeah, it was prior to the comment. And so when, in the end of January, early February, when Mr. Hardesty talked to the supervisor, that's when she said, hey, I'm suspicious of Ms. Morris and this other employee, Mr. Franco, because both of their sales numbers are really high, but I've gotten reports that they're not really working with the customers, so it seems a little fishy. I actually want to audit those people. And so that's why she started the audit of them prior to this comment ever happening. And they were both terminated for it because the audit revealed that they had multiple work orders entered minutes apart that artificially increased their... Was there anybody else that was part of that? Were they the only two that were investigated from that store or were there others? From that store, those were the only two people. There were individuals in other stores as well, but in that store it was just the two of them. So you said there were 19 people terminated for this exact reason, but when I looked at the sites on that, it seems like about half of them were for other reasons, like ER-153 is someone who misled customers into purchasing a service by falsely representing that it was free. ER-157 is someone who went to a volunteer event and claimed to pay for a volunteer event. Those don't sound like the same conduct. No, so the 19 people that were terminated were terminated by... So Desiree Chestnut, she's the director of the department, and in her view, anybody who violates the standards of business conduct to essentially what they consider stealing from the company, meaning getting commission that wasn't owed, that's what she was talking about, similar conduct, fraudulent conduct that increased their commissions that essentially amounted to what they considered stealing from the company. And in doing what Ms. Morris and Mr. Franco did, and there was several other employees that did the same thing, Mr. Boramond, who was the one that was fired from the Van Nuys store for that exact same conduct, that falls in the same category with these other 19 individuals that did similar conduct that was a violation of their standards of business conduct. Okay, thank you. I think I better cut you off because you're at 11 minutes now, so thank you, counsel. We'll give your opposing counsel two minutes for rebuttal. I'll do it speedily, Your Honor. First of all, the March 8th incident is... Well, the incident occurred on March 5th. On March 8th, Hardest Day and Santiago called each employee and individually to try to explain Hardest Day's reason for giving that. This shows that they knew that something wrong had happened, okay? And that constituted a complaint and... But the audit started before that, right? Well, you know, first of all, there's no documentary evidence to support that. There's only the testimony of Santiago, all the documents of the investigation show that it occurred in March. Second, I'm just beating here, Your Honor. Plaintiff was the only one who filed a formal complaint with HR. Nobody else did. But that complaint was on March 28th or end of March, right? Yeah, she was terminated shortly thereafter. So, I mean, by then the audit was definitely underway and even complete, right? Yeah, but she had already made a complaint under the FEHA on March 8th when she reported to Santiago that she felt this was inappropriate and she wasn't... But so had other people who then weren't terminated, right? Yeah, two other people did that, but only Morris went to HR. She was terminated after she went to HR. Did she not do that until much later, until the audit, so the timeline with the audit is more problematic for her? The audit was submitted to HR, I believe, shortly before she formally complained to HR, but the decision to terminate her was made after she formally complained to HR. Also, I would like to point out that the audit results reported to HR by Mr. Hardestay, who was the one who was really trying to protect himself here, were false. Supposedly 93 accounts were audited, 27 of which were found to be improper. Ms. Santiago testified in her deposition that 1,200 accounts were audited, not 93. So that skewed the results and made it look like 30% of the audited accounts were improper when, in fact, only 2% had multiple work orders. I think that's a significant fact that Hardestay reported false audit results to HR. I think I need to cut you off because we're now well over two minutes. Well, she had one extra minute, so I just want to say, on our first point about whether or not a single act is sufficient reporting, there's a Ninth Circuit case, Trent, Valley, Electric, at 41F3-524 and 526. That a reasonable good faith belief is what gives rise to the protected activity. And the California Foundational case is Janowitz, which I'm sure you all have heard many, many times, at 36K4, and the specific page of that is 1043. Thank you. Thank you, both sides, for the helpful arguments. We appreciate your attendance by telephone today. And the case is now submitted, and happy holidays. Same to you. Thank you all, Your Honors. Happy holidays. Thank you, Your Honor. Take care.
judges: Schroeder, Friedland, R. Nelson